ALLSTATE INSURANCE COMPANY,
Plaintiff-Appellee,

v.

Frank N. YOUNG, Jr.,
Defendant-Appellant,

James E. Keane and wife, Catherine Keane, and David M. Hitchcock,
Intervenors-Appellants.

Supreme Court of Tennessee,
at Knoxville.

Oct. 12, 1982.

Ray Siener, Chattanooga, for defendant-appellant.

Robert J. Harriss, Rossville, Ga., Robert A. Frazier, Chattanooga, for intervenors-appellants.

R.R. Ruth, Jr., Chattanooga, for plaintiff-appellee.

## OPINION

DROWOTA, Justice.

This case was originally brought by Allstate as an action for a declaratory judgment that an automobile accident which its insured, Frank N. Young, Jr., had on August 5, 1977, was not covered under his Allstate policy. Young filed a counterclaim essentially charging not only that the policy did cover the accident, but also that Allstate, because of its actions, was estopped to deny coverage. Mr. and Mrs. James Keane and David Hitchcock, who were injured in the accident and had obtained judgments against Young, were permitted to intervene and made similar assertions of both coverage under the policy and estoppel. At the hearing, after Allstate presented its case, Young and the intervenors moved for a directed verdict which, after further argument and discussion among the attorneys and the court, was granted. Thus, the trial court held that the accident was covered under the language of the policy, as a matter of law, and awarded damages to the injured parties and to Young, who had himself incurred medical expenses and attorney fees. The Court of Appeals reversed, and we affirm its holding with modifications.

Among the undisputed facts are that Young had been insured for several years by Allstate. The policy renewed every April 17. Allstate also insured Young's father. As of early February, 1977, Young had the insured vehicle changed to a 1973 Chevrolet Caprice. A few days later, he purchased a 1977 Jeep. He never informed Allstate of his ownership of this vehicle, or requested that it be covered under any provision of the policy. The Jeep was at all times fully operable and available for Young's use. In June, 1977, he bought a 1973 van which was not capable of being operated, and it was kept parked on Young's property.

On August 3 or 4, 1977, Young sold the 1973 Chevrolet which was specifically described in the insurance policy. On August 5, he was driving the Jeep, carrying three passengers, including Hitchcock, and was involved in the aforementioned accident when he collided with the Keane's vehicle. Young himself was hospitalized. Allstate took a statement from him within the next couple of days, which statement was unsigned. It took two more statements on August 23. These contain some conflicts, but basically recite the way in which the accident took place and the history of ownership of the Chevrolet, the Jeep and the van.

Young's premiums at all times were paid and the policy was in full force and effect. The payment of premiums thus covered the period after the sale of the Chevrolet. On August 19, coverage was changed to the van, which Young caused to be repaired, and an adjustment was made to the premium due for the remainder of the policy year.

Before the hearing, the parties entered into a stipulation, which in turn incorporated by reference certain other documents. These included the three statements given by Young to Allstate. They also included the form of Young's policy, without a "Declaration" section; and a "Reservation of Rights and Nonwaiver" which had been executed by Allstate and by Young and his then-attorney before this action was filed. The stipulation established that Young had written Allstate on October 25, 1977, but a copy of such letter is nowhere in the record. It is also established that a letter was sent to Young on November 15, 1977, by All-

state's District Claims Manager. Such letter is said to be attached to the stipulations, but is not found at that point in the record on appeal. (In it, Allstate disclaimed any coverage of the accident because the Jeep did not come within the definition of vehicles which were covered "and for other reasons.")

Young, the Keanes and Hitchcock requested a jury for determination of issues of fact. At a pretrial conference, the judge to whom the case was assigned ruled that the issue of coverage under the policy was a legal issue and not a factual matter for jury determination. The court further noted that many factual matters were being stipulated. The case was heard before a special Chancellor sitting by designation, and the parties again discussed the propriety of impanelling a jury. All agreed that the ultimate issue was whether or not there was coverage under the facts of this case; and that interpretation of the language of the contract was indeed for the court. However, Young and the intervenors felt that the issue of estoppel was factual and required a jury. The court felt that there was no right to a jury in a declaratory judgment action, and the parties excepted in order to preserve their right to appeal the ruling. However, when the court held in these parties' favor on the substantive issue—that the accident was covered—and Allstate appealed such holding, Young and the intervenors did not raise the denial of a jury trial on appeal.

A preliminary issue which has been raised concerns whether or not two depositions are reviewable on appeal. These were given by Young and by a service representative of Allstate. Part of Young's deposition was read into the record by counsel for Allstate during the presentation of its case, and there is no dispute that these excerpts are reviewable. The depositions were filed in the clerk's office before the hearing. At the hearing, after Allstate had presented its case, defendants had moved for a directed verdict, and the court had rendered his judgment, the following exchange took place between counsel for the Keanes and the court:

MR. FRAZIER: Judge, for the sake of completeness, I am assuming that everything that is in that technical record is part of our record.

THE COURT: I take the position that everything that has been filed with the Clerk and Master and is in that file is part of the technical record.

MR. FRAZIER: Specifically the depositions of both—

• • • • •

THE COURT: I really think that whatever gets filed in the Clerk's office in the case is a part of the record. I believe it to be.

MR. FRAZIER: That is our intention. I wanted to make sure that was the intention of my opposing counsel that those depositions in their entirety—

THE COURT: If it is not, then I stand to be corrected. The Court of Appeals has never been bashful about pointing out the error—

• • • • •

MR. FRAZIER: For the sake of clarity, I would like to tender those two as part of the technical record. They have been filed with the Clerk and have been stamped and that's our intentions.

THE COURT: They are part of the record.

This case was tried on October 31, 1979. The Tennessee Rules of Appellate Procedure took effect July 1, 1979. One of the primary purposes of Rule 24 was to abolish the distinction between the bill of exceptions and the technical record. Rule 24(a) specifically sets out what the "record on appeal" shall consist of.

The final decree entered by the court notes that the plaintiff's case consisted of the stipulations, the documents incorporated therein, and a portion of the defendant's deposition. The remainder of the depositions was not mentioned as having entered into the court's decision. We agree with the Court of Appeals that the depositions in their entirety are not reviewable on appeal. We can only consider on appeal the evi-

dence considered by the Chancellor. *Nold v. Selmer Bank & Trust Co.,* 558 S.W.2d 442, 445 (Tenn.App.1977); TRAP 13(c).

Based upon the transcript of the hearing, it appears that the Chancellor determined as a matter of law that the policy covered the Jeep, and that the court did not reach the issues concerning estoppel. The depositions are not needed for a determination of the question of law before us, whether the accident in the Jeep was within the language of the policy. The contents of the depositions pertain more to the factual issues raised by Young and the intervenors, which are to be resolved on remand.

■ We turn now to the substantive issue: whether or not Allstate presented a prima facie case of no coverage based upon the evidence presented at the hearing. This issue turns upon the correct interpretation to be given the language of the policy, the case law which has been applied in analogous situations, and the facts set out in the stipulations and attached documents.

The relevant language of the policy is:

## SECTION I

### LIABILITY PROTECTION

Automobile Liability Insurance
COVERAGE AA—Bodily Injury
COVERAGE BB—Property Damage
Allstate will pay for an insured all damages which the insured shall be legally obligated to pay because of:

1. bodily injury sustained by any person, and

2. injury to or destruction of property, arising out of . . . use . . . of the *owned automobile. . .*

.　　.　　.　　.　　.

Definitions of words used under this Section

.　　.　　.　　.　　.

2. Automobiles Covered

.　　.　　.　　.　　.

(b) *"owned automobile"* means the vehicle described in the declarations, and, as defined herein, any replacement automo-bile, any additional automobile . . . ; however, this definition shall not apply under any coverage unless a premium is charged for the application of such coverage with respect to such vehicle;

(c) *"replacement automobile"* means a private passenger . . . automobile of which the named insured *acquires ownership during the policy period, provided it replaces* the owned automobile; if no expiration date is stated in the declarations, policy period means the period of time stated on the premium statement which is current at the time of the *acquisition* of the automobile.

(d) *"additional automobile"* means an additional private passenger . . . automobile of which the insured *acquires ownership during the* policy period provided Allstate *at the time of acquisition* specifically insures all other private passenger . . . automobiles owned by the named insured, and further provided notice of its *delivery* be given to Allstate within 60 days after *such acquisition* and any additional premium be paid by the named insured.

Additionally, counsel for defendant and intervenors pointed out language dealing with notice and adjustment of premium "if during the policy period the number of insured automobiles" changes. However, this language is found in a subsection headed "Conditions" within Section II of the policy, dealing with uninsured motorist coverage. Therefore, it is not relevant to a determination of coverage under the liability portion (Section I) of the policy. Bolstering this conclusion is the fact that there is a separate section headed "General Conditions," found at the end of the policy, which expressly applies to the entire policy.

The parties stipulated that Young purchased a fully operable Jeep, in February, 1977, at a time when he had a fully operable Chevrolet as the automobile described in the policy. It is undisputed, and was held by the court, that at the time the Jeep was acquired, it was an "additional automobile" as defined in the policy. There can be no rational contention otherwise. Young could

have acquired automatic coverage of the Jeep from the date of its purchase by properly notifying Allstate within 60 days thereafter, in which case Allstate would have adjusted the liability premium to cover two insured vehicles. We note that an "additional automobile" is clearly defined from the perspective of the date on which *ownership was acquired,* February 3, 1977.

However, Young elected not to activate automatic coverage of the Jeep. It was rightly conceded that if an accident had occurred while Young was driving the Jeep, after the end of the sixty-day notice period but before he sold the Chevrolet, such accident would not have been covered by the policy.

Young argues, however, that a new "automatic coverage" period began to run on August 3 or 4, 1977, the date on which he sold the Caprice. On that date, instead of having two operable vehicles, he only had one, and thus began using that one exclusively. Young argues that on the date of sale of the Caprice, the former "additional automobile" became a "replacement automobile." Thus, he says, his accident in the Jeep on August 5 was covered without his having notified Allstate to change his liability coverage to the Jeep.

We agree with the Court of Appeals that the language of the policy is unambiguous and did not cover the accident. The language is clear and is given its common, ordinary meaning, so that rules of construction of ambiguous language are not called into play. Young's and the intervenors' interpretation of the "replacement automobile" definition is completely anomalous. We cannot hold that "acquires ownership" has two different meanings in the "replacement" and "additional" provisions—that Young "acquired ownership" of the Jeep once as an additional automobile in February and "acquired ownership" of the same vehicle again in August. Within the "replacement automobile" definition, both "acquires" and "replaces" are in the present tense, clearly showing that the character of an automobile as a replacement is determined at the time of acquisition, not at

some indefinite time to be determined in the future. Young's Jeep was either an additional or a replacement vehicle on February 3, 1977, it could not be one thing at one time and something else at another time. If Young wanted to change his coverage from a described automobile to another which he had owned for some length of time but had never insured, the normal procedure is usually to inform the insurer of the desired change, which would be effective prospectively, but not retroactively. Young's policy even expressly contemplates that the insured may own a vehicle which is either uninsured, or insured by someone other than Allstate, which would not be eligible for automatic coverage: An "additional automobile" is automatically covered only if Allstate specifically insures all other private automobiles of the insured.

We find cases which have previously been decided under Tennessee law to be highly persuasive. The landmark case is *Kelly v. State Farm Mutual Automobile Insurance Co.,* 256 F.Supp. 978 (E.D.Tenn.1966), wherein the car described in the policy at all times was a Rambler. On October 12, 1965, the Rambler became inoperable. The insureds purchased a Chrysler to drive while the Rambler was being repaired. Between October 12 and December 6, both cars were driven. On December 6, repairs had been completed on the Rambler, and the insureds decided that the Chrysler was better suited to their needs. They sold the Rambler, and on December 12, their son was in an accident while driving the Chrysler. It was noted that as of December 6, "plaintiffs would testify that on that date they intended to replace the Rambler with the Chrysler; and [State Farm] can offer no proof to the contrary .... Plaintiffs claim the thirty day notice period did not begin to run until December 6, 1965, the date the Rambler was sold, on which date plaintiffs state they intended the Chrysler to replace the Rambler described in the policy." 256 F.Supp. at 979.

The provision of the State Farm policy which was analogous to the provision at issue in this case, was the definition of a

"newly acquired automobile." The definition required that the *ownership* of the automobile be *acquired* by the insured; that it replace a covered automobile; and that the insured notify the company within thirty days of its delivery date. The company denied coverage on the ground that it had not been notified within thirty days after ownership was acquired.

Thus, the parties' positions were exactly the same as they are in the present case. The insurer argued that replacement had to take place when ownership was acquired, under the plain meaning of the policy, in October, 1966. The insureds argued that the policy contemplated that replacement took place whenever they intended to replace an insured vehicle with a previously uninsured vehicle, which was in December, 1966.

The court held the policy language clear and unambiguous. Whether or not a car was a replacement had to be determined as of the time its ownership was acquired. The court relied on *Yenowine v. State Farm Mutual Automobile Insurance Co.*, 342 F.2d 957 (6th Cir. 1965), and noted that *Yenowine* and *Kelly* "both ... point up the burden upon the insurance company if an 'intention' rather than the overt act, specifically called for in the policy, namely, the 'delivery' of replacement automobile, were allowed to control the policy coverage." *Id.* at 981. The court went on, "Such weakness would not arise if the clear language of the policy were applied. When the Chrysler in our case was delivered, it was not a replacement, since the old car was not disposed of, and was not incapable of further service, and was to be repaired." *Id.*

A later case, somewhat less closely analogous to the case at bar, is *Federal Mutual Insurance Co. v. Hanks*, 545 S.W.2d 93 (Tenn.1976). Therein, the issue was whether an automobile owned before the policy was issued was "newly acquired" so as to constitute a replacement vehicle covered by the policy. In January, 1966, Hanks bought a 1955 car and took it to a garage to be put in running condition. In February, he bought a 1957 car for use until the 1955 car became operable. In March, he obtained an insurance policy naming the 1957 car as the insured vehicle. The company was not informed of the 1955 car.

In July, the covered 1957 car needed repair. Hanks took it to the garage and began using in its stead the 1955 car, changing the license plates from the 1957 to the 1955 car. Two days later, he was in an accident. Three days after this, he had his agent change the coverage from the 1957 to the 1955 car.

This Court held that there could be no automatic coverage of the 1955 automobile under these circumstances.

The ... provision [defining a newly acquired automobile], though standard, has been the subject of much litigation. With very few exceptions, the Courts have held that the provision is free from ambiguity and that in order to be "newly acquired" so as to come within the policy coverage, an automobile must have been acquired after the commencement of the policy. [Citation.] *See also* 7 Appleman, Insurance Law and Practice, § 4293, p. 92 wherein it is stated: "Nor is a vehicle newly acquired when it is previously owned by· the insured and merely put back into service."

Noting the above general rule, the majority of the Court of Appeals held that "the rule in Tennessee is that ordinarily, absent unusual circumstances, the 'newly acquired automobile' provisions of automobile liability insurance policies will not afford coverage for automobiles owned by the insured at the time the policy was issued."

... It does not follow ... that ownership of an automobile is not acquired until the automobile is placed into service as a vehicle of transportation. *The key to coverage of a "newly acquired automobile" is not when it comes into service as a vehicle of transportation, but when it was acquired.*

545 S.W.2d at 94–95 (emphasis added).

We see no validity to the distinction, made by the trial court between the above two cases and the present case, that in the

two cases the defined term was "newly acquired automobile." The emphasis should be upon the logic and reasoning supporting the holding as to whether a vehicle, owned simultaneously with a described vehicle, becomes a "replacement" when the described vehicle at some point is disposed of or becomes inoperable. The entire thrust and import of the language in Frank Young's Allstate policy are indistinguishable from the import of the policies construed in the *Kelly* and *Hanks* cases. Whether an automobile is a "replacement" or is "additional" must be determined at the time ownership of the vehicle is acquired. Ownership cannot be acquired twice in order to make the vehicle come within different definitions at different times.

Copious research of the authorities and of cases from other jurisdictions, including cases cited to us by Young and the intervenors, convinces us that our interpretation of this policy is correct and that Tennessee law is in the mainstream on this issue. See, *Fleming v. Nationwide Mutual Insurance Co.*, 383 F.2d 145 (4th Cir. 1967); *Yenowine v. State Farm Mut. Automobile Ins. Co.*, supra; *Lambert v. Alabama Farm Bureau Mutual Cas. Ins. Co.*, 281 Ala. 196, 200 So.2d 656, 658 (1967); *LaSalle National Insurance Co. v. Popham*, 125 Ga.App. 724, 188 S.E.2d 870 (1972); *Continental Cas. Co. v. Employers Mut. Cas. Co.*, 198 Kan. 93, 422 P.2d 560 (1967); *Brown v. State Farm Mutual Automobile Ins. Co.*, 306 S.W.2d 836 (Ky.1957); *Beck Motors, Inc. v. Federal Mutual Insurance Co.*, 443 S.W.2d 200 (Mo.App.1969).

*Contra, Silverstein v. Liberty Mut. Ins. Co.*, 505 F.2d 158 (5th Cir. 1974); *State Farm Mutual Automobile Ins. Co. v. Johnston*, 9 Cal.3d 270, 107 Cal.Rptr. 149, 507 P.2d 1357 (1973); *Corbett v. Allstate Insurance Co.*, 396 Mich. 103, 238 N.W.2d 30 (1976); *St. Paul Fire & Marine Insurance Co. v. Nyquist*, 286 Minn. 157, 175 N.W.2d 494 (1970); *Adams v. Covenant Security Insurance Co.*, 465 S.W.2d 32 (Mo.App. 1971); *National Indemnity Co. v. Giampapa*, 65 Wash.2d 627, 399 P.2d 81 (1965).

Counsel for Young and the intervenors have asserted that the determination of the "policy period" is crucial to the interpretation of this policy. The policy was renewed each year, for a one-year period, on April 17. The policy states that "if no expiration date is stated in the declarations, policy period means the period of time stated on the premium statement which is current at the time of acquisition of the automobile." Counsel argued that since Young paid a premium each month for ten months, with no payments being due the last two months of the policy year, a "policy period" is one month. This is not particularly convincing, since under that interpretation, each year would contain nine one-month and one three-month "policy periods." The premium was charged on an annual basis, even though for the convenience of the insured, it was payable in installments. An extra charge was made for this privilege extended to Young. The trial court did not accept this interpretation, holding that "policy period" meant "policy year"; because, although there was no *fixed* date of expiration, the policy would expire each April 17 if not renewed. The court also noted that the Stipulations incorporated the Reservation of Rights and Non-Waiver Agreement into which Allstate and Young had entered before this action was brought. This clearly indicated that the "policy period" was considered to be one year in duration. We feel that this construction is correct. However, under either interpretation, the policy period in effect at the time the Jeep was acquired was different from that which was in effect when the Jeep ostensibly became a replacement vehicle. Again, this underscores the fact that acquisition of the new car and replacement of the old must be contemporaneous.

Based upon the foregoing, we affirm the holding of the Court of Appeals that according to the language of the policy, the trial court was in error when he ruled that as a matter of law, this accident was covered by the liability section of the policy. In other words, Allstate presented a prima facie case of no coverage.

■ This does not end our inquiry, however, for it is argued by Young and the

intervenors that even if the accident was not within the language providing coverage, it was covered nevertheless under an estoppel theory. The intervenors alleged in their complaints that Allstate was estopped to deny coverage because of representations made to Young, his father, and the intervenors after the accident; because it accepted premiums following the accident; and because of its agents' conduct in investigating the accident. Young's counterclaim was somewhat more detailed. He asserted that as soon as practical, Allstate was notified of the accident; that it sent an adjuster who took statements from him without his having benefit of counsel; that it made a complete investigation. Thereafter, it took control of the Jeep, removed it to an insurance storage lot, and had it sold for salvage. He averred that Allstate was aware of the vehicle involved in the wreck, yet accepted premiums and gave the impression of adjusting the loss. It did not refuse coverage until four months after the accident.

Clearly, questions of fact are presented by these statements, which must be resolved if Young and the intervenors are to refute Allstate's prima facie proof of no coverage.[1] Young should be entitled to show any prior course of dealing between himself and Allstate whereby Allstate may have knowingly provided automatic coverage for a vehicle which Young had already owned for a period of time.[2] It is at this point uncertain whether or not Young had a copy of his policy, which could have affected his understanding of what the policy covered.

If it should be determined that there is no estoppel, and no coverage under the liability portion of the policy, it would remain to be determined whether or not there was coverage for Young or any third party under Section IV, Coverage CC, "Automobile Medical Payments Insurance."

On the other hand, if the company is found to be estopped to deny coverage, it must be determined whether Young followed the proper procedure in presenting his claim, just as any other policyholder would be required to do.

The decision of the Court of Appeals is affirmed as modified, and the cause is remanded to the trial court for further proceedings consistent with this opinion. The costs of this appeal shall be taxed ⅓ to plaintiff, ⅓ to defendant and ⅓ to intervenors.

FONES, C.J., and COOPER and HARBISON, JJ., concur.

BROCK, J., dissents.

BROCK, Justice, dissenting.

I dissent from the holding of the majority that the insured's 1977 Jeep was not covered by his automobile liability insurance policy with Allstate under the "replacement automobile" provision of that policy at the time it was involved in an accident on August 5, 1977.

The policy, in its automatic coverage provisions, contains the following definitions:

"(c) 'Replacement automobile' means a private passenger or utility automobile of which the named insured acquires ownership during the policy period, provided it replaces the owned automobile; if no expiration date is stated in the declarations, the policy period means the period of time stated on the premium statement which is current at the time of the acquisition of the automobile;

---

1. The trial court held that as a matter of law Allstate was not guilty of bad faith in declining coverage here, even in view of his finding that the language of the policy covered the accident. This ruling is not appealed and is no longer an issue in this case, especially as we have ruled in Allstate's favor on the question of construing the contract.

2. We note that when Young's third vehicle, the van, was rendered operable after the accident and Young notified the company of his desire to cover it, such coverage was prospective only.

"(d) 'Additional automobile' means an additional private passenger or utility automobile of which the named insured acquires ownership during the policy period, provided, Allstate at the time of acquisition specifically insures all other private passenger and utility automobiles owned by the named insured and, further, provided notice of its delivery be given to Allstate within sixty (60) days after acquisition and any additional premium to be paid by the named insured."

Prior to February 3, 1977, the insured owned only one automobile, a 1973 Chevrolet, which was the vehicle described in the declarations of the policy and is referred to as the "described automobile." On February 3, 1977, while still owning and continuing to use the Chevrolet, the described automobile, the insured bought a 1977 Jeep vehicle. Still later, in May or June, 1977, he also bought a non-operative automobile van which was never operative until after the accident involved in this case. On August 3 or 4, 1977, the insured sold and delivered the Chevrolet, the "described automobile." On August 5, 1977, the insured, while operating the above mentioned Jeep automobile, was in an accident which precipitated this litigation.

The insured contends that the Jeep was covered as a "replacement automobile" within the above quoted definition. The Jeep was the only driveable vehicle he had at the time of the wreck. If it was not insured as a replacement vehicle under the policy, then the insured was paying premiums for nothing during the period from August 3 or 4 when the Chevrolet was sold until August 19, 1977, when the van was named as the described automobile under the policy.

It is not denied that the ownership of the Jeep was acquired by the insured during the policy period nor that the Jeep in fact became a replacement for the Chevrolet described in the policy on the date the Chevrolet was sold on August 3 or 4, 1977. The only argument Allstate makes is that the Jeep did not replace the Chevrolet described in the policy at the time the Jeep

was purchased on February 3, 1977. The trouble with this argument is that it assumes a provision not to be found in the policy, i.e., a provision that, in order to be insured as a "replacement vehicle" under the policy, the replacing automobile must have replaced the described automobile *at the time of acquisition* of the replacement vehicle.

Certainly, Allstate knew how to make that distinction for in the very next paragraph of its policy it did so as follows:

"(d) 'Additional automobile' means an additional private passenger or utility automobile of which the named insured acquires ownership during the policy period provided Allstate *at the time of acquisition* specifically insures all other private passenger and utility automobiles . . . ." (Emphasis added.)

Thus, if Allstate had intended in the preceding subparagraph (c) to make the point that a replacement vehicle must replace the described vehicle *at the time of acquisition* it could, would and should have said so. Its failure to do so requires that we construe the "replacement automobile" definition in favor of the insured and against the insurance company which wrote the policy. *Palmer v. State Farm Mut. Auto. Ins. Co.*, Tenn., 614 S.W.2d 788 (1981).

In *Palmer* we said:

"In construing contracts of insurance, we attempt to ascertain the intent of the contracting parties and, since the policy was drafted by the insurance company, we must resolve all ambiguity and doubt in favor of the insured. We need not abandon common sense; indeed, we are required to exercise common sense in construing these policies." 614 S.W.2d at 789.

By simply denying that there is any ambiguity in the "replacement automobile" definition in this policy the majority has, in effect, reversed the rule quoted in *Palmer* and is construing the current policy in favor of the insurance company.

There can be no question under the applicable case law and the terms of this policy, that if the insured had decided to sell the

Chevrolet described in the policy, subsequently had purchased the Jeep and begun to use it only after selling the Chevrolet, it would be a replacement vehicle covered by the policy. *Mitcham v. Travelers Indemnity Co.*, 127 F.2d 27 (4th Cir. 1942). But, here, the insured claims that he may dispose of the described vehicle and replace it with another vehicle which he already owns so long as the replacing vehicle was purchased after the policy was issued.

There is strong support for the insured's argument that the Jeep was a replacement vehicle in our case law which requires that the terms of insurance policies be given their ordinary meaning, absent proof of a specialized meaning used in the insurance business. This meaning does not depend upon the intent of the insurer alone, but is what a reasonable insured would believe the meaning to be, giving ordinary meaning to the words used. *Hahn v. Home Life Ins. Co. of New York*, 169 Tenn. 232, 84 S.W.2d 361 (1935); *Palmer v. State Farm Mut. Auto. Ins. Co., supra.* Here, there is no language in the policy to indicate that a replacement vehicle must be newly acquired or purchased for the purpose of replacing the described vehicle.

Moreover, to decide this case in favor of the insurance company allows it to collect premiums for a period of time during which it provided no insurance whatsoever, that period being from August 3, 1977, until August 19, 1977, when the van which was inoperable at the time of its purchase was repaired after the accident here in question and placed under the policy.

I respectfully dissent.