IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 4, 2021

## IN RE F.S., ET AL.

**Appeal from the Circuit Court for Bradley County**
No. V-18-392        Lawrence Howard Puckett, Judge
_____

## No. E2020-00906-COA-R3-PT
_____

This case involves a petition to terminate the parental rights of the parents of two minor children. After a trial on the petition, the trial court granted the petition and terminated the parents' parental rights. The trial court found that the ground of "severe child abuse" was proven by clear and convincing evidence and that it was in the best interest of the children to terminate the parents' parental rights. Both of the parents appealed. We affirm the trial court's decision and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Wencke West, Cleveland, Tennessee, for the appellant, Amber S.[1]

Sheridan C. F. Randolph, Cleveland, Tennessee, for the appellant, Charles S.

Herbert H. Slatery, III, Attorney General and Reporter; and Lexie A. Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.        FACTS & PROCEDURAL HISTORY

---

[1] In juvenile court actions, to protect the privacy of children, the policy of this Court is to use only the first name and last initial (and in some cases, just the initials) of the parties involved. *See In re C.W.*, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

Amber S. ("Mother") and Charles S. ("Father") (collectively "Parents") are the biological parents of two minor children, F.S. and P.S. (collectively "the children"). F.S. was born in June 2014, and P.S. was born in September 2018. This appeal involves a petition to terminate Parents' parental rights to the children.

In August 2017, F.S. was living with Parents in an apartment. On August 7, 2017, the Department of Children's Services ("DCS") received a referral that alleged Parents were exposing F.S. to illegal drugs and that F.S. lacked supervision. The next day, the referral was investigated. As a result of the investigation, Parents consented to drug screens and tested positive for illegal substances. Father tested positive for THC, methamphetamine, and amphetamine. Mother tested positive for THC, methamphetamine, amphetamine, and benzodiazepine. Because of Parents' drug use and exposing F.S. to drugs, F.S. was removed from Parents' custody and placed in the protective custody of DCS. Based on the drug exposure, the Juvenile Court of Bradley County adjudicated F.S. dependent and neglected by Parents under Tennessee Code Annotated section 37-1-102(b)(13).

After F.S. was removed from Parents' custody, Parents were evicted from their apartment. Without the means to find another home, Mother spent several weeks in a homeless shelter. The record is unclear as to Father's residence during this time. Eventually, Parents were able to reside together in a one-bedroom, one-bathroom room at a motel called the Mountain View Inn. While Parents were residing at the Mountain View Inn, P.S. was born. DCS met with Parents and determined that, at that time, they had the necessary items to care for P.S. and that there were no immediate safety concerns for P.S.

In early November 2018, approximately six weeks after P.S. was born, Mother contacted DCS and reported that she no longer had stable housing. Father had moved out of the motel room, and Mother was unable to maintain it on her own. Mother also reported that before Father left, he was smoking methamphetamine in the motel bathroom while she and P.S. were present. Later, Father admitted to these claims. Mother submitted another drug screen and tested positive for methamphetamine, amphetamine, and marijuana. Mother admitted to using marijuana and was aware that it could have contained drugs other than marijuana. Despite knowing this, Mother continued to breastfeed P.S. Due to Parents' drug use and exposing P.S. to drugs, DCS removed P.S. from Parents' custody.

At a hearing before the Juvenile Court of Bradley County, P.S. was adjudicated dependent and neglected under Tennessee Code Annotated section 37-1-102(b)(13). The juvenile court made this determination based on Parents' drug use and their lack of suitable or stable housing for P.S. Additionally, because Parents admitted to exposing P.S. to methamphetamine, the juvenile court determined that P.S. suffered severe child abuse under section 37-1-102(b). Based on these findings, the juvenile court determined it would be contrary to P.S.'s best interest to be in Parents' custody, so it placed P.S. with her brother, F.S., in the care of a foster family.

Shortly after P.S. was removed from Parents' custody, Parents' housing arrangements dramatically changed. On February 24, 2019, Father was arrested and incarcerated in Georgia for harboring a fugitive. He was released on April 8, 2020. After being unable to maintain a residence at the Mountain View Inn, Mother became homeless.

In October 2019, DCS initiated this case by filing a petition to terminate Parents' parental rights.[2] In the petition, DCS listed "severe child abuse" as one potential ground for termination.[3] The trial court heard the petition on June 5, 2020. Mother, Father, Jennifer Deal (DCS Family Service Worker), Jennie Cagle Hare (Omni Vision resource coordinator), and the foster mother testified. Fourteen exhibits were admitted, including the adjudicatory and dispositional orders issued by the Juvenile Court of Bradley County that adjudicated the children dependent and neglected and found that P.S. was a victim of severe abuse while in the care of the parents.

At trial in this case, Mother testified that since residing at the Mountain View Inn, she had remained homeless, being forced at times to live outside or in a friend's van. At the time of trial, she stated that she still did not have a place of her own but that she was staying at a friend's house. Father also testified that he does not have a home but stays with a friend. Parents have been homeless partly because they lack the necessary funds to obtain a place of their own. After being released from prison in April 2020, Father obtained a job earning ten dollars per hour. However, he stated that he began this position only one week before trial and had not been able to save enough funds to obtain a place to live. Father stated that he relied on a friend to transport him to work. Mother testified that she does not work but receives $750 per month in disability income.

Jennifer Deal was the family service worker assigned to the children's case. At trial, Ms. Deal testified that she attempted to help Mother find a place to live. Ms. Deal stated that she gave Mother resource packets with information on potential places to live. She also stated that she suggested to Mother that she could apply for public housing at places where the wait list would not be too long. At one point, Mother was attempting to obtain a trailer home, so Ms. Deal provided her with paperwork that indicated DCS could pay the

---

[2] Initially, DCS brought two separate petitions, one in the name of each child. Those petitions were voluntarily nonsuited, and DCS filed the current action involving both of the children. It appears from the parties' briefs and the record as a whole that the appellate record does not contain the orders that nonsuited the prior petitions. The transcript of the proceeding for the previously-filed petitions was submitted to this Court. Although the transcript is before this Court, it will not be considered in this appeal. *See Allstate Ins. Co. v. Young*, 639 S.W.2d 916, 918-19 (Tenn. 1982) (stating an appellate court "can only consider on appeal the evidence considered by the [trial court]"); *Nicholson v. Nicholson*, No. M2008-00006-COA-R3-CV, 2009 WL 3518172, at *7 (Tenn. Ct. App. Oct. 29, 2009) (stating an appellate court cannot "consider evidence that was not heard by the trial court").

[3] The petition filed by DCS included several other alleged grounds, but only "severe child abuse" is relevant to this appeal. At trial, DCS only proceeded on the "severe child abuse" ground.

first month's rent.  Although Mother's income has been limited, Ms. Deal testified that if Mother received a grant to live in public housing, her financial burden would be substantially less.  Despite Ms. Deal's efforts, Mother refused to live in public housing and remained homeless.  According to Ms. Deal, Mother refused public housing because she knew that once Father was no longer incarcerated, as a registered felon, he would not be able to live in the home with her.

Mother disputed much of Ms. Deal's testimony on her housing troubles.  Mother claimed that she did not want to live in public housing because the wait lists were too long and because they were not clean.  However, she also testified that she knew public housing does not allow felons, so Father would not be able to live with her at those locations.  Mother was concerned that if she lived in public housing without Father, she would be forced to care for the children by herself.  In contrast to Ms. Deal's testimony, Mother claimed that she received very little help in obtaining housing.  Mother claimed she was informed only shortly before trial that she could receive help obtaining subsidized housing.  Yet, she also admitted that she learned she could receive help obtaining an initial deposit several months before trial.  As of trial, Mother was still without a home and had no pending applications for housing.  She stated that she planned on living with Father after he saved enough money for them to obtain a home of their own.

After the children were removed from Parents' custody, they were placed in foster care.  F.S. lived in two foster homes that eventually closed before he was placed in his current foster home.  The children are currently placed in a pre-adoptive home where they have lived since April 2019.  Parents were granted supervised visits with the children after they were removed from their custody.  The visits took place at a DCS office.  Before Father was incarcerated, he participated in the visits in-person.  After he was incarcerated, Mother would call him during visits so he could participate by video or telephone.

Mother testified that Parents visited F.S. on a regular basis when he first entered DCS custody in August 2017.  Mother testified that these visits went well and that they would play or read books together.  However, Ms. Deal stated that there were multiple instances when she had to intervene because of how Parents were behaving.  Ms. Deal testified that Parents would act inappropriately during visits by focusing on each other rather than F.S. or by Mother talking on her cell phone, which was prohibited by the visitation guidelines.   There were also reported instances when Parents would inappropriately rub each other's legs and whisper to each other during visits.

Ms. Deal also stated that there were visits where Mother would become upset and angry in front of F.S.  At one visit, F.S. arrived wearing glasses.  Mother was not told that he needed glasses before the visit.  When Mother saw F.S. wearing glasses, she became very angry and upset in front of F.S.  She admitted that she was upset when she saw F.S. wearing glasses, stating that she did not understand how a young child could tell someone that he or she needed glasses.  Aside from admitting that there were instances when she

- 4 -

would become upset, Mother denied acting inappropriately at visits.

Ms. Deal stated that Parents missed visits with F.S. for several months once Mother became pregnant with P.S. After P.S. was born, Parents began visiting again on a regular basis. Based on her observations from supervising visits, Ms. Deal stated that Mother did not appear to be well bonded with P.S. Parents' most recent visit took place over a video chat a few weeks prior to trial.[4] The children were in their foster home at the time the video visit took place. Shortly after the visit began, F.S. became disinterested, wandered off the computer screen, and became unresponsive to Parents. P.S., who was still a young toddler at the time, sat in front of the camera playing with her toys. Once Parents realized the children were disinterested in the video visit, they requested that the visit end after approximately fifteen minutes.

Despite the visitation issues, Parents submit that they have positive relationships with both of the children. Mother testified that she has "no problems" with F.S. and that she has always been supportive for him. Considering P.S.'s young age, Mother believes her relationship with her is also positive. Father also testified that he had a positive relationship with F.S. despite not visiting him in-person for nearly two years. Like Mother, Father stated that his relationship with P.S. is positive but admitted that there has not been much of an opportunity to develop a bond with her.

In comparison to the children's relationships with Parents, several witnesses testified on their strong relationship with their current foster parents. Ms. Deal stated that the children are doing very well in their current foster home and that they are bonded with the foster parents. Jennie Cagle Hare, resource coordinator assigned to the children, testified that the children and the foster parents are well bonded. She stated that the family frequently engages in interactive activities and that the children refer to the foster parents as "mom" and "dad." The foster mother also testified on the children and their progress since entering her custody.

The foster mother testified that when the children first entered the custody of her and her husband, F.S. was aggressive and had many behavioral issues. She stated that F.S. had trouble expressing himself and would often lash out by hurting the family pets or other children. While in the foster parents' care, F.S. was diagnosed with a high-functioning form of autism. According to the foster mother, F.S. requires some adjustments to his physical environment to be comfortable. To help F.S., the foster parents arranged therapy sessions to help him adjust to the new home and to improve his behavior. The foster mother testified that after receiving therapy for several months, F.S. has exhibited major improvements. She stated that F.S. now interacts well with others and is gentle and affectionate with their pets.

---

[4] Parents' ability to visit in-person was disrupted by the social distancing protocols related to the COVID-19 pandemic.

As for P.S., the foster mother testified that she is generally a healthy young girl. P.S. has experienced some reoccurring ear infections and contracted hand, foot, and mouth disease, in the winter of 2019. The foster parents obtained medicine to treat P.S.'s hand, foot, and mouth issue and went to a pediatrician for her ear infections. The pediatrician recommended putting tubes in P.S.'s ears to prevent infections, but P.S. could not obtain the tubes without receiving permission from Parents.

Along with providing help for the children's medical and educational needs, the foster mother testified on the family's support in everyday life. In her home, F.S. and P.S. each have their own bedroom. Previously, the foster mother worked full time. After the children entered the foster parents' custody, the foster mother stopped working outside of the home in order to focus her attention on taking care of the children. She also spoke about the activities that they enjoy, such as taking them on walks, to parks, to museums, and to aquariums. Before the COVID-19 pandemic, F.S. enjoyed participating in Tae Kwon Do classes and piano lessons. According to the foster mother, the children refer to her and her husband as "Mama" and "Daddy." The foster mother stated that if the children become available for adoption, they would adopt them "at the drop of a hat."

Aside from many of the facts previously discussed, Parents testified on their progress since the children left their custody. Parents discussed their progress on the family permanency plans that were developed in conjunction with Ms. Deal. Under the plans, Parents were required to complete several action steps, including: (1) complete a drug and alcohol assessment and follow its recommendations; (2) maintain sobriety; (3) provide proof of a transportation and child care plan; and (4) maintain stable housing. According to Mother, except for obtaining suitable housing, she completed all of the required steps, including remaining sober and completing her assessments. However, she also admitted that she does not have her own means of transportation. Mother admitted to failing drug tests in the past, but she asserted that it has "been a while" since she used drugs. Father also admitted to using drugs in the past and stated that he knows his drug use was one of the reasons that the children left his custody. Despite his past use, Father asserted that he has not used drugs since before he was incarcerated.

Mother claimed that she was told she was not allowed to speak with the foster parents, but the foster mother testified otherwise. According to the foster mother, she frequently attempted to interact with Mother at visitations in an effort to help keep her informed about the children's progress. She testified that she created a private email address for Mother to receive or request updates and photos of the children, but she never received any correspondence from Mother. The foster mother testified that over time, her interactions with Mother became increasingly tenuous.

Ms. Hare and the foster mother also testified on recent visitations that resulted in F.S. exhibiting abnormal behaviors. The foster mother stated that F.S. understands when

they are going to visit Parents and became very upset on one occasion when a visit was cancelled en route to the DCS office. Despite the foster parents' best efforts to calm him down, when F.S. learned the visit was canceled, he acted out and threw tantrums. Ms. Hare testified that after the more recent video visit at the foster family's home, F.S. became overwhelmed and confused. Ms. Hare was at the home to help set up and supervise the video visit. After the visit ended, F.S. took a nap that lasted approximately three hours and woke up having urinated himself, which had not occurred in a long time.

At the conclusion of trial, the trial court rendered an oral ruling. On July 28, 2020, the court entered a final written order terminating Parents' parental rights. In its written order, the court credited Ms. Deal's testimony on providing reasonable assistance in helping Parents obtain housing and on the problematic circumstances surrounding the visits with the children. Based on the juvenile court's order that found P.S. was severely abused, the trial court found the ground of "severe child abuse" was proven by clear and convincing evidence. The court also found that it was in the best interest of the children to terminate Parents' parental rights. As a result, the trial court terminated the parental rights of Mother and Father.

Both Mother and Father timely appealed.[5]

## II. ISSUES PRESENTED

Two issues have been presented for review in this appeal:

1. Whether the trial court erred in finding that there was clear and convincing evidence of grounds to terminate Parents' parental rights for committing "severe child abuse" against P.S.; and

2. Whether the trial court erred in finding it was in the best interest of the children to terminate Parents' parental rights.

For the reasons stated herein, we affirm the trial court's decision and remand.

## III. STANDARD OF REVIEW IN TERMINATION CASES

The Due Process Clauses in the federal and state constitutions recognize a parent's

---

[5] Mother filed her notice of appeal before the trial court entered its final written order. Although Mother's notice of appeal was filed prematurely, her early filing does not disrupt her right to an appeal. *See* Tenn. R. App. P. 4(d) ("A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof."). After Father filed his notice of appeal, each notice of appeal was assigned separate case numbers. Thereafter, this court *sua sponte* entered an order consolidating the cases. Since then, all filings for each notice of appeal have been made under the case number E2020-00906-COA-R3-PT.

fundamental right to the care and custody of his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016); *In re Braxton M.*, 531 S.W.3d 708, 718 (Tenn. Ct. App. 2017). It is one of the oldest judicially recognized liberty interests. *In re Carrington H.*, 483 S.W.3d at 521; *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although it is a fundamental right, it is not absolute. *In re Carrington H.*, 483 S.W.3d at 522; *In re Audrey S.*, 182 S.W.3d at 860.

A party seeking to terminate the parental rights of another must prove two elements. First, the petitioner must prove one of the statutory grounds for termination listed under Tennessee Code Annotated section 36-1-113(g). *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013). Second, the petitioner must prove that terminating the parent's rights is in the best interest of the child. *In re Kaliyah S.*, 455 S.W.3d at 552; *In re Adoption of Angela E.*, 402 S.W.3d at 639. "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Audrey S.*, 182 S.W.3d at 860. Therefore, certain protections are afforded to the parent, including the petitioner being required to prove these elements by clear and convincing evidence. *In re Carrington H.*, 483 S.W.3d at 522; *In re Kaliyah S.*, 455 S.W.3d at 552. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (internal citations omitted). It must "eliminate[] any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)).

In parental termination cases where the court makes findings of fact, the factual findings are reviewed de novo with a presumption of correctness. Tenn. R. App. P. 13(d); *In re Adoption of Angela E.*, 402 S.W.3d at 639. "We review questions of law de novo with no presumption of correctness." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)).

## IV.   DISCUSSION

### A.  Severe Child Abuse

When a parent appeals a trial court's decision to terminate parental rights, this Court is required to review each ground for termination found by the trial court, "regardless of whether the parent challenges" each ground on appeal. *In re Carrington H.*, 483 S.W.3d at 525-26. In this case, Mother does not take issue with the trial court's finding on the ground of "severe child abuse." Regardless, we must review this ground as it applies to both Mother and Father.

Under Tennessee Code Annotated section 36-1-113(g)(4), a court may find grounds to terminate parental rights if the parent "has been found to have committed severe child

abuse, as defined in [section] 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child."

The plain language of section 36-1-113(g)(4) makes clear that "the finding of severe abuse can be based on a prior court order or on evidence of 'severe child abuse' submitted to the court hearing the termination case." *In re Brianna T.*, No. E2017-01130-COA-R3-PT, 2017 WL 6550852, at *4 (Tenn. Ct. App. Dec. 22, 2017). "It is well settled that a trial court may rely on a prior court order finding severe child abuse as a ground for termination and is not required to re-litigate the issue of severe abuse during the termination trial, so long as the prior order is final." *In re Neamiah R.*, No. E2017-02000-COA-R3-PT, 2018 WL 2331868, at *6 (Tenn. Ct. App. May 23, 2018). This Court has consistently applied the doctrine of *res judicata* to prevent a parent from re-litigating the issue of severe child abuse in a parental termination proceeding when the finding of severe child abuse has become final. *See In re Karisah N.*, No. M2018-00555-COA-R3-PT, 2018 WL 6179470, at *10 (Tenn. Ct. App. Nov. 27, 2018); *In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016). "[A] severe abuse finding in a dependency and neglect action becomes final when it was not timely appealed following the dependency and neglect hearing." *In re Caydan T.*, No. W2019-01436-COA-R3-PT, 2020 WL 1692300, at *5 (Tenn. Ct. App. Apr. 7, 2020) (citing *In re Karisah N.*, 2018 WL 6179470, at *10; *In re Dakota C.R.*, 404 S.W.3d 484, 497-98 (Tenn. Ct. App. 2012)).

In the present case, the juvenile court found by clear and convincing evidence that P.S. was the victim of "severe child abuse" based on Parents knowingly exposing her to methamphetamine.[6] This finding was based on Father smoking methamphetamine in the presence of P.S. and Mother knowing that he was exposing P.S. to the harmful drug. Based on the finding of severe child abuse, the juvenile court adjudicated P.S. dependent and neglected under Tennessee Code Annotated section 37-1-102(b)(13).

Neither Mother nor Father appealed the dependency and neglect order that found Parents committed "severe child abuse" against P.S. Therefore, that order has become final and any challenge to the findings therein is barred by *res judicata* in this appeal. *See In re Karisah N.*, 2018 WL 6179470, at *10. As a result, the trial court correctly determined that the ground of "severe child abuse" under section 36-1-113(g)(4) was sufficiently proven by clear and convincing evidence. Despite Father's argument that drug use by Parents was no longer an issue at the time of trial, the issue is binding on this Court based on Parents' decision to forgo filing an appeal of the dependency and neglect order.

We note that it is irrelevant that the juvenile court found that only P.S. was a victim

---

[6] Tennessee Code Annotated section 37-1-102 has undergone several revisions in recent years. The juvenile court cited a previous subsection number for the definition of "severe child abuse." Currently, the definition is listed under section 37-1-102(b)(27).

of "severe child abuse." Section 36-1-113(g)(4) clearly states that the commission of "severe child abuse" can serve as a ground for termination of parental rights when a parent has committed the act "against *any* child." Tenn. Code Ann. § 36-1-113(g)(4) (emphasis added). "The plain language of the statute does not require that the prior order have any specific temporal proximity or nexus to the current child at issue or the proceedings currently being adjudicated." *In re I.E.A.*, 511 S.W.3d at 516-17 (concluding that the severe abuse committed by the mother was sufficient to constitute a ground for termination as to all of the children at issue for purposes of section 36-1-113(g)(4)).

Having concluded that at least one ground for termination of parental rights was proven by clear and convincing evidence, we shall now determine whether termination is in the best interest of the children.

## B. Best Interests Analysis

"When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest." *In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016) (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). To make this determination, courts consider and apply the factors listed in Tennessee Code Annotated § 36-1-113(i). *Id.* at 607. The factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult

in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The relevancy and weight a court places on each factor depend on the facts of each case. *In re Audrey S.*, 182 S.W.3d at 878. While each factor must be considered, courts are not required "to find the existence of each factor before it concludes that terminating a parent's rights is in the child's best interest." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *16 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)). Each factor should be viewed from the child's perspective and any conflict of interests between a parent and a child is resolved in favor of the best interest of the child. *In re Navada N.*, 498 S.W.3d at 606; *White v. Moody*, 171 S.W.3d at 194.

Beginning with factors (1) and (2), like the trial court, we applaud Parents' efforts to remain sober and refrain from associating with known drug users. However, the main issue in their lives continues to be a lack of housing. By their own testimony, it was evident that as of trial they were still without a home and had no prospects available in the immediate future. Throughout the children's time in DCS custody, time and again Mother decided to remain homeless rather than obtain public housing. Although she claimed that she did not receive adequate support from DCS in finding a place to live, the trial court credited Ms. Deal's testimony that DCS made reasonable efforts to assist Parents in this area. We see no reason to question the trial court's credibility determination on appeal. *See Addalyne S.*, 556 S.W.3d 774, 786 (Tenn. Ct. App. 2018) ("Findings based on credibility are afforded great weight by this Court."). Thus, we agree with the trial court that factors (1) and (2) weigh in favor of termination.

Throughout trial, there was some dispute as to whether Parents missed visitations

with the children and, if they did, how often they missed. Regardless, the trial court found that Parents maintained regular contact with the children. The evidence does not preponderate against this finding. *See* Tenn. R. App. P. 13(d); *In re Adoption of Angela E.*, 402 S.W.3d at 639. Factor (3) weighs in favor of Parents maintaining their parental rights.

Even though Parents visited the children on a regular basis, the evidence shows that the quality of those visits was often poor. Parents argue that their relationship with the children and their visits were positive. Ms. Deal testified otherwise, stating that there were several problems with the visitations. She stated that one of the reasons Parents did not move past supervised visits was because these problems continued to occur even after Ms. Deal explained the visitation guidelines. More recently, Parents and the children shared a video visitation. Although conducting a visitation over a video stream is not ideal, the children's lack of interaction during the visit and F.S.'s reaction after the visit ended do not show a strong connection to Parents. During the visit, the children were not focused on speaking with Parents, and they quickly became disinterested. After the visit ended, Ms. Hare testified that F.S. exhibited negative behaviors such as becoming overwhelmed and confused and by soiling himself. In observing the visits between Mother and P.S., Ms. Deal concluded that Mother was not well bonded with P.S. Despite Parents' testimony that they have a quality relationship with the children, the trial court credited Ms. Deal's testimony on the visitations being difficult due to Parents' behavior and on Parents not having a positive relationship with the children. Again, on appeal, we afford great weight to the trial court's credibility determination. *See Addalyne S.*, 556 S.W.3d at 786. Taken together, factor (4) weighs in favor of termination.

Under factor (5), we agree with the trial court that Mother's reaction to F.S. wearing glasses and her lack of empathy for the children's needs was surprising. When Mother was informed that the children required medical care, she would often withhold consent or would become upset. In contrast, Ms. Deal, Ms. Hare, and the foster mother testified at length on the care the foster parents have provided for the children. The foster parents helped obtain necessary medical care for the children and arranged therapy for F.S. Ms. Deal stated that the foster parents have been cooperative with DCS. Ms. Deal, Ms. Hare, and the foster mother also agreed that the foster parents have developed a strong and positive bond with the children. They have provided suitable housing and care for the children, and the foster mother testified that, if the children become available for adoption, she and her husband would happily adopt them. Thus, factor (5) also weighs in favor of termination.

Factor (6), "[w]hether the parent . . . has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child," Tenn. Code Ann. § 36-1-113(i), also weighs in favor of termination. As we previously discussed, P.S. was found to be the victim of "severe child abuse" due to Parents exposing her to methamphetamine. Although Parents claim that they have made significant progress in

remaining sober and changing their lifestyle, based on the juvenile court's findings, it is clear that they abused P.S. when she was previously in their care.

As of trial in June 2020, Parents were without a home and had been without a home for a significant period of time. While Parents argue that they are no longer engaged in the use of controlled substances, they have yet to resolve their housing issue. Without a home, they will continue to be unavailable to properly care for the children. Therefore, factor (7) weighs in favor of termination.

We agree with the trial court that there was insufficient evidence to make a finding on factor (8). Similarly, while there was passing testimony on the support provided for the children by Parents, we further agree that there is insufficient evidence to make a finding on factor (9).

After applying the factors listed in Tennessee Code Annotated section 36-1-113(i) to the facts of this case, we agree with the trial court that there is clear and convincing evidence to show that it is in the best interest of the children to terminate both Mother and Father's parental rights.

## V. CONCLUSION

For the foregoing reasons, we affirm the trial court's order terminating Parents' parental rights to the children. We affirm the trial court's finding that there is sufficient evidence to support the ground of "severe child abuse." We affirm the trial court's conclusion that it is in the children's best interest to terminate Parents' parental rights. Thus, we affirm the trial court's ultimate decision to terminate Parents' parental rights to the children.

This case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against the appellants, Amber S. and Charles S., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

- 13 -